IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO (2) CELLEBRITE DATA EXTRACTIONS CURRENTLY LOCATED ON FILE PATH //SHARE02 IN THE COMPUTER FORENSICS LAB AT HSI/D.C., 12200 SUNRISE VALLEY DRIVE, RESTON, VA 20191 | Case No. 1:26-SW-76 |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER
RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Christine L. Bingham, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of two (2) Cellebrite data extractions currently located on file path //share02, as further described in Attachment A, which are currently stored at the HSI/D.C. Forensics Lab.

2.      I am a Special Agent with Homeland Security Investigations ("HSI") and have been since December 2020. As such, I am an "investigative or law enforcement officer of the United States" within the meaning of 18 U.S.C. § 2510(7), empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 8, 18, 19 and 21 of the United States Code.

3.      I am a graduate of the Federal Law Enforcement Training Center's Criminal Investigator Training Program and the HSI Special Agent Training Program. I am currently assigned to the HSI Washington, D.C./Northern Virginia Field Office in HSI's Violent Crime and Public Safety Group. I was previously assigned to HSI D.C.'s Child Exploitation and Human

Smuggling/Trafficking Groups, where I investigated crimes involving the sexual exploitation of children, including but not limited to, child pornography and human trafficking.

4.    As a Special Agent with HSI, I received training on investigative techniques related to crimes involving the sexual exploitation of children, including obtaining and analyzing digital records, analyzing stored digital media, undercover activities, and the application for and execution of search and arrest warrants. I have conducted and assisted in federal child exploitation investigations and participated in the execution of numerous search warrants in support of child exploitation investigations. Through my training and experience, as well as through conversations with various law enforcement personnel and computer forensic examiners, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children.

5.    This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

6.    The property to be searched are two (2) Cellebrite data extractions (hereinafter the "EXTRACTIONS"). One Cellebrite data extraction is from a black Apple iPhone in a clear case and the other is from a gold-colored Apple iPhone in a clear case (hereinafter the "DEVICES"). The EXTRACTIONS are currently stored at HSI/D.C.'s Computer Forensics Lab, on file path //share02, at 12200 Sunrise Valley Drive, Reston, VA 20191 in the Eastern District of Virginia.

7.    Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2422 (Coercion and Enticement of a Minor), 18 U.S.C. § 2251(a) (Attempted Sexual Exploitation of a Minor), and  18 U.S.C. § 2252A(a)(5)(B), (b)(2) (Access with Intent to View and Possession of Child Pornography and

Attempted Access with Intent to View and Attempted Possession of Child Pornography) (hereinafter the "SUBJECT OFFENSES") has been committed by MARIO ALEXANDER BONILLA CANALES (hereinafter "BONILLA CANALES"), and that evidence, contraband, fruits, and instrumentalities, further described in Attachment B, of these violations will be located within the EXTRACTIONS, more fully described herein and in Attachment A.

8.      The applied-for warrant would authorize the forensic examination of the EXTRACTIONS for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

9.      On Monday, June 16, 2025, the Fairfax County Police Department in Fairfax, Virginia began an undercover chatting operation on the Facebook Messenger application. On that date, the undercover detective ("UCD") engaged via direct messenger with a Facebook account displaying the name "Mario Bonilla" with a date of birth in December of 1975. The UCD is fluent in both Spanish and English.

10.     On Tuesday, June 17, 2025, "Mario Bonilla" messaged the UCD on Facebook Messenger and a conversation began. "Mario Bonilla" asked the UCD if she is married to which she responded, "No I'm only 14 years old." "Mario Bonilla" responded, "Really? Send me your photo." The UCD asked Mario Bonilla if her age bothered him, and "Mario Bonilla" responded, "No, heart." Shortly thereafter Mario Bonilla invited the UCD to meet up with him that weekend.

11.     On Wednesday, June 18, 2025, "Mario Bonilla" requested that the UCD provide her phone number. The UCD and "Mario Bonilla" then began communicating via text. The UCD confirmed that the person she was texting with was "Mario."

12.     When the UCD asked what "Mario" wanted with her, "Mario" stated that he wanted to make her his girlfriend. When asked what they would do as part of their relationship, "Mario" stated he was going to "aserte el amor." The UCD knows that this Spanish expression is commonly used to mean to have sexual intercourse. However, the UCD asked "Mario" what the phrase meant, and he responded, "Sexo" (English translation "sex"). "Mario" said that he would be working outside of the state of Virginia until Friday, June 20, 2025, but that they could meet then. They agreed to meet on the evening of Friday, June 20, 2025.

13.     As the conversation continued, "Mario" stated that he wanted to engage in anal sex with the UCD and that he would use a condom so that it would not hurt. "Mario" then asked to see a photo of the UCD's "little thing"—he confirmed that he meant her vagina. When the UCD declined to send a photograph of her vagina, "Mario" asked for one of her breasts.

14.    On Thursday, June 19, 2025, "Mario" sent a photograph of himself to the UCD upon her request. The photograph and chat are included below. As the conversation continued, "Mario" stated that he would kiss her whole body, and that he wanted her to put her mouth on his penis.



15.    On Friday, June 20, 2025, the day of the meet-up, "Mario" again solicited the UCD for oral sex. The UCD provided "Mario" the address for Jack Carney Park, located in Fairfax County, in the Eastern District of Virginia. "Mario" advised that he would be in a white Honda Accord.

16.    On Friday, June 20, 2025, the UCD asked "Mario" what time he would be arriving to meet her so that she could be ready. "Mario" responded that he didn't know and advised the UCD that he would let her know when he gets to Maryland, because he needed to get his car there before meeting at the park in Virginia.

17.     On the date of the meetup, Friday, June 20, 2025, "Mario" messaged the UCD and informed her that he was in the park. Law enforcement observed a white Honda Accord, bearing Maryland license plate XXXX424 inside the park. When law enforcement units activated their emergency lights to stop the vehicle, the individual operating the vehicle struck two law enforcement vehicles and fled. A vehicle pursuit ensued, before the vehicle was stopped. Database checks show that the vehicle is registered to Mario Alexander Bonilla (with the date of birth described above in December of 1975).

18.     BONILLA CANALES, aka Mario Alexander Bonilla, was identified as the operator of the vehicle after he was apprehended by law enforcement. Officers identified him by his Virginia driver's license and through law enforcement database checks. The driver's license listed the December 1975 date of birth—the same date of birth associated with his vehicle registration and the "Mario Bonilla" Facebook profile.

19.     BONILLA CANALES was then arrested by Fairfax County law enforcement officers and his person and vehicle were searched subsequent to the arrest. BONILLA CANALES had a black Apple iPhone on his person which was seized (one of the DEVICES). Officers also recovered a gold-colored Apple iPhone inside his vehicle (the second of the DEVICES). Condoms were also found in BONILLA CANALES's vehicle.

20.     BONILLA CANALES was charged in Fairfax County with nine offenses related to the sexual exploitation of children and resisting arrest. Approximately four days after his arrest, BONILLA CANALES had a bond hearing and was released on recognizance. The charges in Fairfax remain pending.

21.     Fairfax County Police Department ("FCPD") detectives obtained a Virginia state search warrant for the DEVICES. FCPD requested assistance from HSI to extract data from the

6

DEVICES due to a backlog of pending electronic device extractions in their local jurisdiction. FCPD detectives then provided the DEVICES to this Affiant at HSI/D.C.'s Computer Forensics Lab, in Reston, Virgina. The DEVICES were extracted using Cellebrite by an HSI Cyber Forensics Analyst. The resulting EXTRACTIONS were then saved on file path //share02, and the DEVICES were returned to FCPD detectives. HSI did not review any of the contents of the EXTRACTIONS or DEVICES. HSI still has not done so in the abundance of caution pending this search warrant execution. The EXTRACTIONS remain stored at the Homeland Security Investigations D.C. Computer Forensics Lab, on secure file path //share02, at 12200 Sunrise Valley Drive, Reston, VA 20191.

22.     HSI D.C.'s Violent Crime and Public Safety Group learned that Bonilla Canales had been arrested by FCPD. HSI agents performed records checks which confirmed that BONILLA CANALES is a native and citizen of El Salvador who was removed from the United States on or about May 7, 1999, from Washington, D.C., and on or about September 27, 2016, from Laredo, Texas. BONILLA CANALES did not have legal authorization to reenter or remain in the United States.

23.     I reviewed BONILLA CANALES's immigration file maintained by U.S. Citizenship and Immigration Services. Fingerprints located in the file came back to the same unique FBI number associated with the June 20, 2025, Fairfax County arrest fingerprints. The file confirmed that BONILLA CANALES is a citizen and national of El Salvador and it contained two previously executed Immigration Service Form I-205s "Warrant of Removal/Deportation," bearing BONILLA CANALES's photograph, fingerprint, and signature. Moreover, BONILLA CANALES has prior criminal convictions, including a prior felony

conviction on May 9, 1996, for Possession of Burglarious Tools, prior to his two removals. BONILLA CANALES was sentenced to three years of imprisonment for the offense.

24.    On December 16, 2025, BONILLA CANALES was charged by criminal complaint in the Eastern District of Virginia with one count of Illegal Reentry After Removal Subsequent to a Felony Conviction in violation of 8 U.S.C. § 1326(a) and (b)(1). On December 17, 2025, BONILLA CANALES was arrested by your Affiant and other federal agents for the immigration offense. BONILLA CANALES has since been indicted.[1]

## CHILD PORNOGRAPHY, COMPUTERS, & THE INTERNET

25.    I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience, and knowledge, I know the following:

   a.    Computers and digital technology are the primary way in which individuals interested in child pornography interact with each other. Computers basically serve four functions in connection with child pornography and obscene material: receipt, communication, distribution/transportation, and storage.

   b.    Digital cameras and smartphones with cameras save photographs or videos as a digital file that can be directly transferred to a computer by connecting the camera or smartphone to the computer, using a cable or via wireless connections such as "WiFi" or "Bluetooth." Photos and videos taken on a digital camera or smartphone may be stored on a removable memory card in the camera or

---

[1] When I arrested BONILLA CANALES on December 17, 2025, he was in possession of an Apple iPhone, which we seized and took into evidence. As a part of our investigation into the child exploitation conduct, we obtained a federal search warrant in the Eastern District of Virginia for that device for the offenses described herein, which was sworn out a few weeks ago. That device has been extracted but not yet reviewed.

smartphone. These memory cards are often large enough to store thousands of high-resolution photographs or videos.

c.  A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Mobile devices such as smartphones and tablet computers may also connect to other computers via wireless connections. Electronic contact can be made to literally millions of computers around the world. Child pornography can therefore be easily, inexpensively, and anonymously (through electronic communications) received, distributed, and transported by anyone with access to a computer or smartphone.

d.  The computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. Electronic storage media of various types, including computer hard drives, external hard drives, CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices that are plugged into a port on the computer, can store thousands of images or videos at very high resolution. Some media storage devices can easily be concealed and carried on an individual's person. Smartphones and/or mobile phones are also often carried on an individual's person.

e.  The Internet affords individuals several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion.

f.  Individuals also use online resources to retrieve and store child pornography. Some online services allow a user to set up an account with a remote computing service that may provide email services and/or electronic storage of computer files in any variety of formats. A user can set up an online storage account

9

(sometimes referred to as "cloud" storage) from any computer or smartphone with access to the Internet. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer, smartphone, or external media in most cases.

g. Applications or "apps" on smartphones or mobile computing devices consist of software downloaded onto mobile devices that enable users to perform a variety of tasks—such as engaging in online chat, sharing digital files, reading a book, or playing a game—on a mobile device. Individuals commonly use such apps to receive, store, transport, and distribute child pornography, to interact directly with other like-minded offenders or with potential minor victims, and to access cloud-storage services where child pornography may be stored. For example, in this case, BONILLA CANALES used the Internet and social media to attempt to entice a person he believed was 14-years old to send him sexually explicit material.

h. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional (i.e., by saving an email as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files) or unintentional. Digital information, such as the traces of the path of an electronic communication, may also be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or

"footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## CHARACTERISTICS COMMON TO INDIVIDUALS WHO
## COLLECT CHILD PORNOGRAPHY

26.     Based on my previous investigative experience related to child exploitation investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I know there are certain characteristics common to individuals who collect child pornography. As outlined in the paragraphs below, as well as the investigation to date and my training and experience, I believe BONILLA CANALES to be a collector of child pornography, and that his devices will contain evidence of his possession, access with intent to view, and attempted production of the same:

a.  Such individuals may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

b.  Such individuals often collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, books, and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.  Such individuals almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, videos, magazines, photographs, correspondence, mailing lists, books, etc., in the privacy and security of their home. Individuals who have a sexual interest in children or images of children

12

typically retain their pictures, videos, photographs, magazines, correspondence, mailing lists, books, and child erotica for many years.

d.  Likewise, such individuals often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as a computer and cellular phone. These child pornography images are often maintained for many years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, or in cloud-based online storage, to enable the individual to view the child pornography images, which are valued highly.

e.  Child pornography images and videos can be downloaded onto desktop or laptop computers, computer disks, hard drives, flash drives, system disk operating systems, Internet-capable devices, cellular telephones, tablets, iPads, digital music players, and a variety of other electronic data storage devices. Individuals with a sexual interest in children often transfer child pornographic material to multiple electronic devices because of its value to them and/or to create additional storage space for their collections. Additionally, because persons who collect child pornography are often compulsive about this activity, they frequently use multiple electronic devices throughout a home to access material depicting children or to communicate with children, especially when they have resided in the same place for a long period of time. Even if an individual does not intentionally transfer material for purposes of storage, the child pornography material, web history, communications, and other relevant evidence will likely still be located on

multiple devices in their possession because, for example, of the frequency of "backing up" or "synching" mobile phones to computers or other digital devices.

f.  Such individuals also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses (including email addresses), and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. Such correspondence may take place, for example, through online bulletin boards and forums, Internet-based chat messaging, email, text message, video streaming, cellular telephone, and in person.

g.  Moreover, persons who attempt to produce, access with intent to view, and possess child pornography typically use the Internet to search for materials or information about the age group they are most interested in. They may also communicate directly with minors via social media, text message, phone calls, or email.

h.  Such individuals prefer not to be without their child pornography for any prolonged time period. The nature of these materials, their attraction to the content within them, and the risk involved with their possession of such materials, motivates them to keep the materials within their possession and control wherever they go. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

14

i. In this case, as described above, BONILLA CANALES is likely a collector of child pornography. He has the common characteristics associated with collectors in that he chatted using social media and the Internet with someone he believed to be 14-years old about sex and requested a photograph of the purported 14-year old's vagina, as well as attempted to meet her for sex. Therefore, the DEVICES seized on the day he went to meet up with the purported 14-year old are likely to contain evidence not only of his attempted production and enticement of the purported 14-year old, but also of his possession and access with intent to view other child pornography over the years.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crime described in the warrant, but also forensic evidence that establishes how the DEVICES were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence extracted from the DEVICES might be included on the DEVICES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Apart from user-generated files, electronic media on a mobile device contain evidence of how the device was used. For instance, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache" without action by the user of the device.

c.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

d.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

e.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on an electronic device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual

16

information necessary to understand other evidence also falls within the scope of the warrant.

f.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the EXTRACTIONS consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the EXTRACTIONS to human inspection in order to determine whether it is evidence described by the warrant.

28.    *Manner of execution.* Because this warrant seeks only permission to examine data extractions already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**CONCLUSION**

29.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the EXTRACTIONS, described in Attachment A, which contains or constitutes evidence, fruits, instrumentalities, and/or contraband related to the SUBJECT OFFENSES.

30.    There is probable cause to believe that BONILLA CANALES violated 18 U.S.C. § 2422 (Coercion and Enticement) when he traveled to the Eastern District of Virginia, from outside of the state of Virginia, to have sexual intercourse with an individual who he believed to be 14 years old.  There is also independent probable cause to believe BONILLA CANALES committed this offense because he requested a sexually explicit image of a person he believed to be 14-years old when he asked for a picture of the purported 14-year old's vagina.

31.    There is probable cause to believe that BONILLA CANALES violated 18 U.S.C. § 2251(a) (Attempted Sexual Exploitation of a Minor) when BONILLA CANALES employed, used, persuaded, induced, enticed or coerced an individual who he believed to be 14 years old to take a photograph of her vagina for the purposes of sending the photograph of her vagina to BONILLA CANALES.  Had the UC truly been a 14-year old girl and sent the image, BONILLA CANALES would have committed the completed crime of production.

32.    There is probable cause to believe that BONILLA CANALES has violated 18 U.S.C. § 2252A(a)(5)(B), (b)(2) (Access with Intent to View and Possession of Child Pornography, as well as Attempted Access with Intent to View and Attempted Possession of Child Pornography) because, as outlined above, BONILLA CANALES' conduct and characteristics, specifically his ongoing sexual conversations with a person he believed to be 14-years old, his attempt to obtain child pornography from that person, and his travel to meet this

18

girl for sex (and his purchase of condoms beforehand, demonstrate that he has a sexual interest in children and is a collector of child pornography.

33.    I therefore request that the Court issue the proposed search warrant authorizing he examination of the EXTRACTIONS in order to seek the items described in Attachment B.

Respectfully submitted,

Special Agent Christine Bingham
Homeland Security Investigations

Subscribed and sworn pursuant to
Fed. R. Crim. P. 41 and 41(d)(3)
on January 26, 2026:

HONORABLE WILLIAM E. FITZPATRICK
UNITED STATES MAGISTRATE JUDGE

Alexandria, Virginia

20

## ATTACHMENT A

The property to be searched are two (2) Cellebrite data extractions (hereinafter the "EXTRACTIONS"). One Cellebrite data extraction is from a black Apple iPhone in a clear case and the other is from a gold-colored Apple iPhone in a clear case (hereinafter the "DEVICES"). The EXTRACTIONS are currently stored at the Homeland Security Investigations D.C. Computer Forensics Lab, on file path //share02, at 12200 Sunrise Valley Drive, Reston, VA 20191.

This warrant authorizes the forensic examination of the EXTRACTIONS for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.      The items, information, and data to be searched are fruits, evidence, and information relating to contraband or instrumentalities, in whatever form and however stored, within the EXTRACTIONS described in Attachment A, relating to violations of 18 U.S.C. § 2422 (Coercion and Enticement of a Minor), 18 U.S.C. § 2251(a) (Attempted Sexual Exploitation of a Minor), and 18 U.S.C. § 2252A(a)(5)(B), (b)(2) (Access with Intent to View and Possession of Child Pornography and Attempted Access with Intent to View and Attempted Possession of Child Pornography) including, but not limited to:

   a.  Records and information relating to child pornography, child erotica, and visual depictions of minors engaged in sexually explicit conduct, including but not limited to all visual depictions, including still images, videos, films or other recordings of child sexual abuse material and child erotica;

   b.  Communications over messaging applications and text messages that relate to the sexual abuse of children and the coercion and enticement any child to engage in sexually explicit conduct;

   c.   Records and information written or typed that describe or document a sexual interest in children;

   d.  Phone device information and linked accounts that can be used to establish the location and identity of the phone user, including the phone's associated IMEI, Phone Number, Apple ID and linked user accounts (including user handles and names for internet and social media applications, such as Google, Facebook, and Instagram);

e.  Evidence of who used, owned, or controlled the DEVICES at the time the things described in this warrant occurred, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

f.  Evidence of software, or the lack thereof, that would allow others to control the DEVICE, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

g.  Evidence of the attachment to the DEVICES of other storage devices or similar containers for electronic evidence;

h.  Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the DEVICES;

i.  Evidence of the times the DEVICES were used;

j.  Passwords, encryption keys, and other access devices that may be necessary to access the DEVICES;

k.  Documentation and manuals that may be necessary to access the DEVICES or to conduct a forensic examination of the DEVICES;

l.  Records of or information about Internet Protocol addresses used by the DEVICES; and

m.  Records of or information about the DEVICES's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and

2

records of user-typed web addresses.

2.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.      If the government identifies seized materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially protected materials (i.e., communications that are to/from an attorney, or that otherwise reference or reflect attorney advice). At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team.

3